UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| ELEVATION HEALTH, LLC,<br><br>    Plaintiff,<br><br>vs.<br><br>AMERICARE, INC., *et. al.*,<br><br>    Defendants. | Case No.: 2:22-cv-01590-GMN-NJK<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT** |

Pending before the Court is the Motion for Summary Judgment, (ECF No. 62), filed by Plaintiff and Counter Defendant Elevation Health, LLC ("Elevation"). Defendants Jennifer and Mario Gonzalez filed a Response, (ECF No. 65), to which Plaintiff filed a Reply, (ECF No. 67).

For the reasons discussed below, the Court DENIES Plaintiff's Motion as to its claims against both Jennifer and Mario Gonzalez and GRANTS Plaintiff's Motion for Summary Judgment as to the Americare's counterclaims.

I.      **BACKGROUND**

This case arises out of Elevation's order for over-the-counter COVID-19 tests from Americare, a healthcare industry "middle-man" that sources products from suppliers and delivers them to healthcare providers. (Gonzalez Decl. ¶ 2, Ex. 1 to Resp., ECF No. 65-1). Joe Goldsmith, CEO of Plaintiff Elevation, approached Defendant Mario Gonzalez, CEO of Defendant Americare, about a need for COVID-19 antigen tests for resale over-the-counter distribution to its United States' customers. (*Id.* ¶ 3). Prior to this request, Elevation had entered into at least two other contracts with Americare to purchase COVID-19 tests authorized for sale in the United States. (Goldsmith Decl. ¶ 5, Ex. 1 to Mot. Summ. J., ECF No. 62-1). To

source the requested tests, Gonzalez contacted Global Health Supply and Silver Peaks Holdings, (collectively, "GHS"). (Gonzalez Decl. ¶ 4, Ex. 1 to Resp.).  GHS informed him that they had Flowflex COVID-19 tests available that were approved for use by the United States Food and Drug Administration, ("FDA"). (*Id.*).  On October 20, 2021, Mr. Kasbee, a GHS representative, sent Gonzalez an email containing several documents about the "OTC" Flowflex COVID-19 Rapid Antigen Home Test, including a FDA letter stating that the tests had been approved for emergency use authorization, ("EUA"). (*Id.*); (Kasbee Email, Ex. 2 to Resp., ECF No. 65-2).  The email subject line is "Flowflex EUA-ACONlab-FlowflexAG-letter, Shipping Data and Specs." (Kasbee Email, Ex. 2 to Resp.).

Within an hour, Gonazlez forwarded the email to Goldsmith at Elevation without any additional text or changes to the original email from Kasbeee. (Gonzalez Decl. ¶ 5, Ex. 1 to Resp.); (Gonzalez Email, Ex. 7 to Mot. Summ. J., ECF No. 62-7).  The next day, October 21, Goldsmith asked Gonzalez if he could secure the Flowflex tests for $8 per test. (Gonzalez Decl. ¶ 6, Ex. 1 to Resp.).  Gonzalez confirmed the price and represented that he could get the tests within the week. (*Id.*); (WhatsApp Messages at 47–48, Ex. 3 to Resp., ECF No. 65-4).  On October 22, Americare sent an invoice for 59,520 "Flowflex Antigen OTC" tests for $476,160 payable upon receipt. (Oct. 22 Invoice, Ex. 3 to Mot. Summ. J., ECF No. 62-3).  Americare contracted with GHS to buy the tests at $7 per test for a total purchase price of $416,640. (Gonzalez Decl. ¶ 8, Ex. 1 to Resp.).

The tests from GHS arrived in late November and Gonzalez met with a GHS representative at a warehouse to receive them. (*Id.* ¶ 9).  Gonzalez noticed that the tests kits were marked as "CE" and were in blue boxes with white stickers stating "For use under Emergency Use Authorization (EUA) only." (*Id.*); (Resp. to Request for Admission, Ex. 12 to Mot. Summ. J., ECF No. 62-12); (Photographs of Subject Test, Ex. 6 to Mot. Summ. J., ECF No. 62-6).  When Gonzalez asked about the stickers, the representative assured him that the

tests were fully approved as EUA in the United States and showed him a FDA letter purporting as much. (Gonzalez Decl. ¶ 10, Ex. 1 to Resp.). Gonzalez called Goldsmith, showed him the stickers on the boxes, and asked how he wanted to proceed. (*Id.* ¶ 11). Goldsmith approved the delivery and instructed Gonzalez to rush the tests to Maryland. (*Id.*). Americare drop-shipped the COVID-19 tests to warehouses beginning November 24, 2021. (Goldsmith Decl. ¶ 7, Ex. 1 to Mot. Summ. J.).

On January 9, 2022, ACON Laboratories issued a press release explaining that there were two types of Flowflex COVID-19 tests, but that only one of them was approved for sale in the United States. (Acon Press Release, Ex. 7 to Mot. Summ. J., ECF No. 62-7). The Flowflex COVID-19 Antigen Home Tests (white box) were approved, but the Flowflex SARS-CoV-2 Antigen Rapid Tests (blue box) were not. (Acon Press Release, Ex. 7 to Mot. Summ. J., ECF No. 62-7). On the same day, the FDA issued a recall for the CE blue-box tests. (FDA Recall, Ex. 8 to Mot. Summ. J., ECF No. 62-8). This is where the conflict arises. GHS emailed Gonzalez details about the approved white-box tests, which was the email that Gonzalez forwarded to Goldsmith. (Kasbee Email, Ex. 2 to Resp., ECF No. 65-2). So, it appears that both Americare and Elevation expected to receive the approved white-box tests. But the tests that GHS sent, and Americare then shipped to Elevation, were the blue-box tests.

A week after the recall, Goldsmith sent Gonzalez a message stating that the Flowflex tests were "blue boxed and no good." (WhatsApp Messages at 59, Ex. 3 to Resp.). When Gonzalez replied that he didn't know there was a problem with the tests, Goldsmith wrote that perhaps GHS had lied to Americare or were also lied to themselves. (*Id.*). The next day, Goldsmith messaged, "All the tests you supplied were CE!" "This was fraud bro," and "I never ordered CE." (*Id.*). Gonzalez insisted that he had no idea because the boxes said they were EUA authorized, and Goldsmith responded that this was "now a legal issue." (*Id.*).

Gonzalez offered to replace the blue-box tests with approved white-box tests and asked Goldsmith to send back the blue-box tests. (*Id.* at 60–61). Goldsmith said that he would not return the tests because the FDA instructed for them to be disposed of. (*Id.*); (Gonzalez Decl. ¶¶ 19–21, Ex. 1 to Resp.). Goldsmith also declined to provide proof that the tests were actually destroyed. (*Id.*). Gonzalez reminded Goldsmith that he called him when the tests arrived in his warehouse, showed him the blue-box tests, and that Goldsmith agreed they should be shipped. (WhatsApp Messages at 64, Ex. 3 to Resp.). Goldsmith asserted for the first time that he never saw the goods. (*Id.*). Because Goldsmith did not return the tests or provide proof they were disposed of, GHS and Americare did not replace the blue-box tests. (Gonzalez Decl. ¶ 21, Ex. 1 to Resp.). Elevation acquired replacement tests from a different supplier. (Goldsmith Decl. ¶ 13, Ex. 1 to Mot. Summ. J.). According to Elevation, Americare has refused to accept a return of the blue-box COVID-19 tests. (*Id*. ¶ 15).

In September 2022, Elevation initiated the instant action against Americare, Gonzalez, and Mrs. Gonzalez. (Compl., ECF No. 1). Americare filed an Answer and brought Counterclaims against Elevation. (Ans., ECF No. 12). Americare also filed a Third-Party Complaint against GHS defendants based on their representations that the Flowflex tests bought by Americare could be sold in the United States and were approved by the DFA. (Americare First Am. Compl., ECF No. 52). Elevation filed the instant Motion for Summary Judgment on its claims against Americare, the Gonzalezes, and Americare's counterclaims. (*See generally* Mot. Summ. J.). About a month later, Americare filed a Chapter 11 Notice of Bankruptcy. (Not., ECF No. 66). Because of the bankruptcy, Elevation dismissed its claims against Americare, but its claims against Mario and Jennifer Gonzalez, as well as Americare's counterclaims, were not subject to the bankruptcy stay remain unstayed. (Stip. Dismiss, ECF No. 79).

## II. LEGAL STANDARD

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is a sufficient evidentiary basis on which a reasonable fact-finder could rely to find for the nonmoving party. *See id.* "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)). "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quotation marks and citation omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the

nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied, and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). However, the nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts," *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252. In other words, the nonmoving party cannot avoid summary judgment by "relying solely on conclusory allegations unsupported by factual data." *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn

in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

### III.         DISCUSSION

Because the Court granted the parties' stipulation to dismiss Elevation's claims against Americare, this Order will determine whether summary judgment is appropriate on Elevation's remaining claims against the Gonzalezes and on Americare's counterclaims against Elevation. (*See* Order Granting Stip., ECF No. 80).

**A. Elevation's Claims against the Gonzalezes**

The Court begins its analysis with Elevation's claim against Mr. Gonzalez for fraudulent misrepresentation based on communications made prior to the delivery of the blue-box Flowflex SARS-CoV-2 Antigen Rapid Tests. (Compl. ¶¶ 69–80).  To succeed on a fraudulent misrepresentation cause of action, the plaintiff must demonstrate "(1) [a] false representation made by the defendant; (2) defendant's knowledge or belief that its representation was false or that defendant has an insufficient basis of information for making the representation; (3) defendant intended to induce plaintiff to act or refrain from acting upon the misrepresentation; and (4) damage to the plaintiff as a result of relying on the misrepresentation." *Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1386 (Nev. 1998).  "The plaintiff bears of the burden of proving every element of fraud by clear and convincing evidence." *Hunt v. Zuffa, LLC*, 694 F. Supp. 3d 1319, 1328 (D. Nev. 2023).  As the moving party with the burden of proof at trial, Elevation must present evidence "which would entitle it to a directed verdict if the evidence went uncontroverted at trial" and must establish the absence of a genuine issue of fact. *C.A.R. Transp. Brokerage Co.*, 213 F.3d 474, 480 (9th Cir. 2000).

Elevation argues that Gonzalez, as CEO of Americare, made misrepresentations in the email he forwarded to Goldsmith on October 20 and in the invoice mailed on October 22 because he knew he would be providing the blue-box COVID-19 tests rather than the FDA

approved tests. (Mot. Summ. J. 24:22–25).  Gonzalez responds that neither communication contains information that is actually false. (Resp. 10:2–8, ECF No. 65).  The Court agrees with Gonzalez.  The email, originally sent by GHS to Americare, contained true information about the white-box tests that were approved by the FDA.  Neither party disputes this fact.  And the invoice only states that Americare was charging Elevation $476,160 for "Flowflex Antigen OTC" tests.  There are two types of Flowflex Antigen OTC tests, and although Gonzalez and Goldsmith both believed they were ordering the FDA-approved Flowflex Antigen tests, the invoice does not contain any actual false information.

But even if the invoice were construed to be false due to the omission of which Flowflex test was being ordered, Elevation does not provide evidence that Gonzalez knew in October that Americare would be sending Elevation the blue-box tests.  Elevation's only evidence of Gonzalez's knowledge is in a Response to a Request for Admission, where Gonzalez "admits that he found out that the tests were marked CE shortly before they were delivered and that Responding Party informed Joe Goldsmith of as much before their delivery." (Resp. to Request for Admission, Ex. 12 to Mot. Summ. J.).  In the very next answer, Gonzalez denies that he knew, prior to their delivery, that the tests were not authorized for sale by the FDA. (*Id.*).  This discovery admission does not demonstrate Gonzalez's knowledge when the October 22 invoice was sent.  It shows only that he realized the boxes were marked "CE" when they arrived in November, which was the reason he called Goldsmith to ensure Elevation still wanted to proceed with the delivery.  The admission does not provide affirmative evidence that Gonzalez knew in October that Americare would be receive blue-box tests, or even that there were two types of Flowflex Antigen OTC tests.

Elevation's Reply seems to change course and imply that the "false misrepresentation" occurred when Gonzalez "inspected the CE-marked COVID-19 tests and knew the subject COVID-19 tests were marked CE before their shipment." (Reply 12:7–9).  But Elevation does

not explain how Gonzalez's knowledge constitutes a false misrepresentation, and Gonzalez testified that he called Goldsmith to inform him that the boxes were marked CE.  Elevation provided evidence that the CE tests were recalled in January 2022, but this was a month after the boxes were delivered.  There is no evidence to indicate that either party knew in November 2021 that the blue-box tests could not be resold per Americare's initial request.  In fact, Elevation submitted photographs of the tests they received, and the back of the box states that "This product has not been FDA cleared or approved; but *has been authorized by FDA under an EUA*." (Photographs of Subject Test, Ex. 6 to Mot. Summ. J.).  Because Elevation failed to identify a false misrepresentation, and otherwise failed to demonstrate scienter, it's Motion for Summary Judgment is DENIED as to its claim against Mr. Gonzalez.

Elevation's claim for aiding and abetting fraud, brought against Mrs. Jennifer Gonzalez, is similarly DENIED.  To establish aiding and abetting, a plaintiff must show that (1) the primary violator breached a duty that injured the plaintiff, (2) the alleged aider and abettor "was aware of its role in promoting [the breach] at the time it provided assistance," and (3) the alleged aider and abetter "knowingly and substantially assisted" the primary violator in committing the breach. *Terrell v. Cent. Washington Asphalt, Inc.*, 168 F. Supp. 3d 1302, 1314 (D. Nev. 2016) (quoting *Dow Chem. Co. v. Mahlum*, 970 P.2d 98, 112 (Nev. 1998), overruled in part on other grounds by *GES, Inc. v. Corbitt*, 21 P.3d 11, 15 (Nev. 2001).  Because Elevation failed to demonstrate fraud by Mr. Gonzalez, the aiding and abetting claim brought against Mrs. Gonzalez also fails.

### B. Americare's Counterclaims against Elevation

Americare's counterclaims are based on a separate transaction.  Americare alleges that it delivered 9,000 Indicaid COVID-19 tests valued at $41,850 to Elevation, but that Elevation never paid for them. (Ans. ¶¶ 14–33).  Americare therefore brought counterclaims for breach of oral contract, unjust enrichment, and conversion. (*Id.*)  Claims brought *by* Americare are not

stayed in the way that claims *against* Americare are. *See Parker v. Bain*, 68 F.3d 1131, 1138 (9th Cir. 1995).

Americare failed to oppose Elevation's Motion for Summary Judgment. The opening paragraph of the Opposition states, "Defendants MARIO GONZALEZ ("Mario") and JENNIFER GONZALEZ ("Jennifer" and collectively, "Defendants")" oppose the Motion for Summary Judgment. Americare is not mentioned. So even though the Gonzalezes share the same lawyer as Americare, Americare is not an opposing defendant to the pending MSJ.

Because Americare, the nonmoving party, bears the burden on these claims, the Court may grant summary judgment for Elevation if it can demonstrate that Americare lacks sufficient evidence to its claims. *See Celotex Corp.*, 477 U.S. at 323–24. Elevation argues that it did not accept Americare's offer of 9,000 Indicaid tests because a few days after receiving an invoice, Goldsmith discovered that his separate order of Flowflex tests could not be resold in the United States. (Mot. Summ. J. 29:9–13). Elevation also states that there is no evidence of payment or that Americare ever shipped the Indicaid tests to Elevation. (*Id.* 30:2–16). Because Americare did not oppose the Motion or otherwise provide evidence to demonstrate a genuine issue of material fact, the Court GRANTS Elevation's Motion for Summary Judgment as to Americare's counterclaims.

**C. Elevation's Request for Sanctions**

Elevation further requests costs and sanctions associated with preparing for and attending Defendants' depositions, for which they did not appear. (Mot. Summ. J. 12:12–16:16). Because Motions for Sanctions under Rule 37 are properly decided by the Magistrate Judge in this case, the Court DENIES Elevation's request without prejudice to allow Elevation the opportunity to file, within 21 days of this Order, a separate Rule 37 motion if it so wishes.

IV.          **CONCLUSION**

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment, (ECF No. 62), is **DENIED in part and GRANTED in part.**  The Court DENIES summary judgment as to Elevation's claims against the Gonzalezes and GRANTS summary judgment as to Americare's counterclaims against Elevation.

**IT IS FURTHER ORDERED** that the parties will have thirty days from the date of this Order to file a jointly proposed pretrial order pursuant to LR 16-3(b) using the form provided in LR 16-4.

**DATED** this __29__ day of September, 2024.

_____
Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT